IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

INTERNATIONAL PAINTERS &
ALLIED TRADES INDUSTRY
PENSION FUND, et al.,            *

    Plaintiffs,                 *

v.                               *     Case No. 18-cv-02333-ELH

FINCH INDUSTRIAL
COATINGS LLC, et al              *
                                 *
    Defendants.
                                 *

******

**REPORT AND RECOMMENDATIONS**

    This Report and Recommendations addresses Plaintiffs' Motion for Default Judgment (ECF No. 14). On August 27, 2019, in accordance with 28 U.S.C. § 636, and Local Rules 301 and 302, Judge Hollander referred this case to me to review Plaintiffs' motion and to make a report and recommendations concerning damages. (ECF No. 16). I have reviewed Plaintiffs' motion, and the accompanying attachments.[1] For the reasons set forth below, I respectfully recommend that Plaintiffs' Motion for Default Judgment be GRANTED, and damages be awarded as set forth herein.

I.    BACKGROUND

    Plaintiffs include the following entities:

    a.  International Painters and Allied Trades Industry Pension Fund (the "Fund" or "Pension Fund");

---

[1] The Court issued an Interim Order on September 4, 2019, requesting Plaintiffs' Counsel re-submit their time and expense reports, after making applicable adjustment in accordance with Appendix B of the Local Rules. (ECF No. 17). Counsel provided the Court with this supplemental information on September 19, 2019.

b. Tim D. Maitland ("Maitland");

c. Finishing Trades Institute ("FTI"); and

d. The Painters and Allied Trades Labor Management Cooperation Initiative ("LMCI" or "Ancillary Fund")

(collectively "Plaintiffs" and, as to the Pension Fund and Ancillary Fund, the "Funds").
(ECF No. 14 at 1).

Defendants Finch Industrial Coatings LLC and Finch Protective Coatings, Inc. ("Defendants" or "Finch") are Indiana companies and employers in an industry affecting commerce within the meaning of 29 U.S.C. §§ 152(2), (6), (7); 1002(4), (11), and (12). (ECF No. 1 at 4).[2]

Finch entered into a collective bargaining agreement ("CBA") with the International Union of Painters and Allied Trades District Council 91, Local Union 1118 ("Union"). (ECF No. 14-2 at 2). The Fund is a trust fund established under 29 U.S.C. § 185(c)(5). The Fund and Maitland are authorized collection fiduciaries and agents within the meaning of 20 U.S.C. § 1102(a) for the International Union of Painters and Allied Trades Pension Plan ("Pension Plan"), the International of Painters and Allied Trades Annuity Plan ("Annuity Plan"), and the Ancillary Fund. (ECF No. 1 ¶¶ 4, 7, 8). The Pension Plan and Annuity Plan are "multiemployer plans," "employee benefit plans," and "employee benefit pension plans" as defined by ERISA. *Id.* ¶¶ 5–6. Pursuant to the CBA and accompanying Trust Agreement, Finch agreed to make certain payments for time worked by, or paid to, employees of Finch who perform work covered by the terms and conditions of the

---

[2] As discussed in detail below, the Court concludes that these entities are alter egos. To avoid confusion in this Section, they are referred to collectively as "Finch." As pertinent to this case, the Court will note that on July 6, 2015 Victoria Finch filed Articles of Organization with the State of Indiana, incorporating RS Painting Services. (ECF No.1 at 4). On November 18, 2015, Victoria Finch filed Articles of Amendment with the State of Indiana and changed the company's name to Davidson Finch Coatings LLC. (ECF No. 1 at 5). On November 3, 2016, Victoria Finch filed Articles of Amendment with the State of Indiana changing the name of Davidson Finch Coatings LLC to Finch Industrial Coatings LLC. *Id.*

Labor Contract. *Id.* The failure to make such contributions, or to submit either late or incorrect remittance reports results in a delinquency to the Pension Fund. *Id.* As a corporate employer utilizing Union employees, Finch agreed to abide by the terms of the CBA and the Trust Agreement. Those obligations included: (1) making full and timely payment on a monthly basis to the Funds as required by the CBA, Trust Agreement, and plan documents; (2) filing monthly remittance reports with the Pension Fund detailing all the employees or work for which contributions were required under the CBA; (3) producing books and records for an audit upon the Funds' request; and (4) paying liquidated damages, interest, audit costs, and litigation costs, including attorneys' fees expended in collecting amounts due as a result of Finch's failure to comply with its contractual and statutory obligations. (ECF No. 1 ¶ 8).

On or about August 4, 2017, Victoria Finch signed a Promissory Note ("Note") on behalf of Davidson Finch Coatings LLC agreeing that it owed the Funds $30,913.58 in contributions, interest, and liquidated damages for the period of June 2016 and October 2016 through February 2017. *Id.* ¶ 19. In settlement, the parties agreed that Davidson Finch Coatings LLC would pay the Funds $25,818.95 in twenty-four (24) consecutive and equal monthly installments. *Id.* The Note memorializing this is an "agreement" as described in 29 U.S.C. § 185(a). *Id.*

On July 30, 2019, Plaintiffs filed a Complaint in this Court alleging that Finch failed to make the contributions required. *Id.* The Complaint seeks damages under ERISA, for at least the sum certain amount:

> [P]lus any additional amounts which may become due during the pendency of this lawsuit, together with interest, at the rate(s) prescribed by 26 U.S.C. § 6621 from the due date for payment until the date of actual payment, liquidated damages equal to the greater of the interest on the unpaid contributions or liquidated damages provided by the documents governing the ERISA Funds or statute, the cost of any audit and reasonable attorneys' fees and costs incurred in this action or the collection or enforcement of any judgment all as provided under the Trust Agreements, plan documents of the ERISA Funds, and 29 U.S.C. § 1132(g)(2).

*Id.* ¶ 32–34.

The Complaint also requests the sum certain currently due under the Note:

> [P]lus any amount which becomes due and owing during the pendency of this litigation or as a result of an audit together with liquidated damages, interests and costs, including reasonable attorneys' fees incurred in this action or the collection or enforcement of any judgment, as provided in the Labor contract and Trust Agreements

*Id.* ¶ 35–37.

The Complaint further seeks damages under the CBA, for the benefit of the Funds for the sum certain currently due plus

> [A]ny additional amounts which become due and owing during the pendency of this litigation or as a result of an audit together with liquidated damages, interest and costs, including reasonable attorneys' fees incurred in this action or the collection or enforcement of any judgment, as provided in the Labor Contract and Trust Agreements.

*Id.* ¶ 38–41.

The Complaint also requests "such other or further relief, legal or equitable, as may be just, necessary or appropriate." *Id.* ¶¶ 34, 37, 41.

Finch was served with the summons and Complaint on or about August 21, 2018. (ECF No. 14). On October 5, 2018, the Clerk of this Court entered an Entry of Default Judgment as to Finch. (ECF No. 10). On that date, the Court provided Finch with Notice of Default and an opportunity to cure, which it failed to do. On April 12, 2019, Plaintiffs filed a Motion for Default Judgment. (ECF No. 14). Finch did not file an opposition, and the deadline to do so now has passed. *See* Local Rule 105.2a (D. Md. 2018).

In support of their motion, Plaintiffs attached the Declaration of Michael O'Malley, the Delinquency Manager (ECF No. 14-4), and Affidavit of Counsel, Judith Sznyter (ECF No. 14-9). Mr. O'Malley testified that as of April 4, 2019, Defendant owed the Pension Fund: $23,510.46 in

contributions, $2,210.60 in interest, and $4,702.13 in liquidated damages; the Annuity Plan $6,318.01 in contributions, $596.40 in interest, $1,263.60 in liquidated damages; the FTI $487.79 in contributions, $46.03 in interest, and $97.56 in liquidated damages; and the LMCI $487.79 in contributions, $46.03 in interest, and $97.56 in liquidated damages. (ECF No. 14-4 at 3). In sum, Mr. O'Malley asserted that Finch owed $30,804.05 in contributions; $2,899.06 in interest; and $6,160.85 in liquidated damages. (ECF Nos. 14-4 at 3 and 14-1 at 2). Ms. Sznyter's affidavit supported a request for attorneys' fees in the amount of $25,555.95. (ECF No. 14-9 at 2).[3] In total, under the CBA, Plaintiffs seek $65,419.91. (ECF No. 14-1 at 2).

## II. STANDARD FOR DEFAULT JUDGMENT

In reviewing Plaintiffs' Motion for Judgment by Default, the Court accepts as true the well-pleaded allegations in the complaint as to liability. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2011). It remains, however, "for the court to determine whether these unchallenged factual allegations constitute a legitimate cause of action." *Agora Fin., LLC v. Samler*, 725 F. Supp. 2d 491, 494 (D. Md. 2010). If the Court finds liability is established, it will proceed to determine the appropriate amount of damages. *Id.* at 484. In sum, the Court must make two determinations: (1) whether the unchallenged facts in Plaintiffs' Complaint constitute a legitimate cause of action, and if they do, (2) make an independent determination regarding the appropriate amount of damages and the appropriate injunctive relief. *Int'l Painters v. Paper Master LLC*, 2019 WL 32969716, at *3 (D. Md. July 22, 2019).

## III. DISCUSSION

---

[3] The Plaintiffs also request $64,788.53 under § 29 U.S.C. § 1145. (ECF No. 14-1 at 3). Specifically, Plaintiffs contend that the Pension Fund, Annuity Plan, Pension Plan, and FTI are entitled to relief of $30,316.26 for contributions related to the period of June 2016; October 2016 through February 2017; and July 2017 through September 2017. (ECF No. 14-1 ¶ 7). As discussed in detail below, Plaintiffs failed to present sufficient authority to justify an award under both authorities, and finding no defect in judgment, only the former will be awarded.

A.  Alter Ego

Plaintiffs contend that Finch Industrial, Finch Protective, and Victoria Finch, are alter ego/successors/and or a single employer, and thus the Court must find them individually, jointly, and severally liable to the Funds in accordance with the terms and conditions of the CBA. (ECF No. 14-2 at 5).

The alter ego doctrine "was developed to 'prevent employers from evading their obligations under labor laws and collective bargaining agreements through the device of making a mere technical change' in the structure or identity of the employing entity . . . without any substantial change in its ownership or management." *Md. Elec. Indus. Health Fund v. Kodiak Util. Contst., Inc.*, 289 F. Supp. 2d 698, 701–02 (D. Md. 2003) (quoting *Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 308 (1st Cir. 1998)).

In this Circuit there is a two-part test to assess alter ego status. *Heating, Piping & Refrigeration Pension Fund v. Conditioned Air Systems, Inc.*, 2014 WL 1290639, at *4 (D. Md. Mar. 28, 2014) (citing *Alkire v. NLRB*, 716 F.2d 1014, 1019–20 (4th Cir. 1983)). First, the Court must determine "whether substantially the same entity controls both the old and new employer." *Alkire*, 716 F.2d. at 1020. In making this inquiry, courts evaluate a variety of factors including: "continuity of ownership, similarity of the two companies in relation to management, business purpose, operation, equipment, customers, supervision, and anti-union animus." *Id*. If this step is satisfied (as the two entities are substantially the same) the court proceeds to assess "whether the transfer resulted in an expected or reasonably foreseeable benefit to the old employer related to the elimination of its labor obligations." *Id.* In essence, a court must decide "whether a successor corporation is really the predecessor corporation by another name," and the ultimate question in

determining single employer status is whether the two entities are in an arm's length relationship. *Conditioned Air*, 2014 WL 1290639, at *4.

The facts in Plaintiffs' Motion illustrate that the same "entity" controlled both Finch Industrial Coatings and Finch Protective Coatings in terms of both form and substance. In terms of form, according to publicly available information and corporate records filed with the State of Indiana (and provided by Plaintiffs), Finch Industrial Coatings and Finch Protective Coatings share the same incorporator and officer or member, Victoria Finch, as well as the same business address. (*Id.* ¶ 25; ECF No. 14-2 at 5). In terms of substance, the facts surrounding the transfer of operations from Protective Coatings to Industrial Coatings present many of the factors courts have found persuasive in supporting a finding of alter ego status. Specifically, Plaintiffs describe that the entities shared equipment and employees, and the same business purposes. (ECF No. 1 at 8). The evidence establishes that Victoria Finch continued to control operations despite the nominal change from Industrial Coatings to Protective Coatings. Consequently, the first step of the *Alkire* test is satisfied.

As the two entities are substantially the same, the Court's focus turns to the second step of the *Alkire* test — evaluating whether changing the corporate form "provided 'expected or reasonably foreseeable benefit to the old employer related to the elimination of its labor obligations.'" *Md. Electrical Indus. Health Fund v. Masters Electric, Inc.*, 2016 WL 164301, at *4 (D. Md. Jan. 1, 2016) (quoting *Alkire*, 716 F.2d at 1020). Continuity of ownership can be particularly relevant in assessing the expectation or foreseeability of a benefit. *See Kodiak Utility*, 289 F. Supp. 2d 698 at 703.

Here, there is substantial evidence as to continuity of ownership. In May of 2017, Victoria Finch, on behalf of Industrial Coatings, negotiated the Pension Fund regarding the terms of the

Note. Despite these ongoing negotiations, on May 25, 2017, Victoria Finch filed Articles of Incorporation for Finch Protective Coatings. (ECF No. 1 ¶ 26–27). On August 4, 2017, Victoria Finch on behalf of Industrial Coatings, signed the Note. Industrial Coatings was administratively dissolved in January of 2018. *Id.* ¶ 29. It was at best reasonably foreseeable, and at worst expected, that Finch might evade obligations to Plaintiffs by setting up Protective Coatings during the pendency of negotiations between Plaintiffs and Industrial Coatings regarding the Note payment plan. (ECF No. 1 at 8). By incorporating Protective Coatings, Victoria Finch was able to continue her business while evading the substantial debts owed to the Funds by Finch Industrial. Thus, Finch Industrial Coatings and Finch Protective Coatings are jointly and severally liable for Finch's obligations.[4]

B. Liability

Plaintiffs contend that Finch's failure to make the required contributions constitutes a breach of its contractual obligations, and this correspondingly establishes a breach of ERISA § 515 and § 185 of the LMRA. *See* 29 USC § 1145. This Court Agrees. Section 515 provides:

> Every Employer who is obligated to make contributions to a multiemployer plan . . . under the terms of a collectively bargained agreement shall . . . make such contributions in accordance with . . . such agreement.

*Sign Maintenance*, 2016 WL 447319, at *3 (citing 29 U.S.C. § 1145).

As the Court of Appeals for the Fourth Circuit explained, "Section 515 puts multiemployer plans in a stronger position than they otherwise occupy under common law contract principles." *Bakery & Confectionery Union v. Ralph's Grocery Co.,* 118 F.3d 1018, 1021 (4th Cir. 1997). Specifically,

---

[4] The alter ego doctrine was designed precisely for cases like the one before this court, 'when the corporate shield, if respected, would inequitably prevent a party from receiving what is otherwise due and owing from the person or persons who have created the shield.'" *Kodiak*, 289 F. Supp. 3d at 704 (quoting *Mass. Carpenters*, 343 F.3d at 21).

an employer is prohibited from asserting certain defenses against a multiemployer fund that the employer might be able to assert against the union itself.[5]

The LMRA provides for federal jurisdiction over suits for a violation of contract between an "employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). Trustees of employee benefit funds have standing to sue under § 185(a) as third-party beneficiaries of a collective bargaining agreement. *Sign Maintenance*, 2016 WL 447319, at *3. Given the aforementioned analysis, that Finch Industrial is the alter ego, joint employer, or successor employer to Finch Protective Coatings, Plaintiffs have stated a claim for relief against Finch under both ERISA and the LMRA. (ECF No. 14-1 ¶ 3). As described above, Plaintiffs' Complaint alleges that Finch was contractually obligated under the CBA to pay $30,804.04 in contributions to the Pension Plan, Annuity Plan, FTI, and LMCI, and that it failed to so do. (ECF No. 1 at 6). Plaintiffs have therefore proven liability for breach of the CBA. ERISA permits the recovery of damages in an action to enforce the payment of unpaid contributions. 29 USC § 1132(g)(2). Accordingly, I recommend Plaintiffs' Motion for Default Judgment be GRANTED.

B. Damages

As Plaintiffs have proven liability, the Court must now undertake an independent determination of the damages to which they are entitled. *Ackerman*, 2012 WL 251963, at *3. Collectively, the CBA and the Plan provide the same remedies for breach that would be allowed under the ERISA statute. *See Int'l Painters v. K&K Painting, Inc*. 2019 WL 4291677, at *4 (D. Md. Sept. 11, 2019) (awarding damages only under § 185). Under Section 502(g)(2) of ERISA,

---

[5] *See, e.g.*, *Sign Maintenance*, 2016 WL 447319, at *3 (citing cases wherein certain defenses were prohibited, specifically, the defense of fraud in the execution cannot be applied to pension funds, and an oral argument to modify the text of a collective bargaining agreement cannot be enforced against pension plans).

an "employer who fails to make contributions as required by Section 515 is liable to the multiemployer fund for the unpaid contributions, interest on the unpaid contributions, liquidated damages of up to twenty (20) percent of the amount of the unpaid contributions, and reasonable attorneys' fees and costs." *Sign Maintenance*, 2016 WL 447319, at *3 (citing 29 U.S.C. § 1132(g)(2)). These damages are addressed in turn.

Plaintiffs' argument that they are entitled to recovery under *both* ERISA and the LMRA is without support. *See* (ECF No. 14-2 at 21) ("Thus, in addition to the remedies set for in ERISA, plaintiffs are entitled to an award based upon the contractual remedies set forth in the collective bargaining agreement."). To the contrary, Plaintiff has not cited, nor can this Court find, a single instance wherein such an awarded was provided.[6] In the precedent relied upon by Plaintiffs' Counsel — *different* remedies were available under the two statutes — rather than double dipping.[7]

Plaintiffs allege that Finch owes $30,804.05 in unpaid contributions in accordance with the terms of the CBA and 29 U.S.C § 185. (ECF No. 14–1 at 2). Mr. O'Malley testified that this reflects the amount Finch owed and failed to pay for the period of June 2016, October 2017–February 2017, and July 2017–September 2017. (ECF No. 14-4). Specifically, Mr. O'Malley

---

[6] *See e.g., Operating Engineers v. Gustafon Const. Corp*, 258 F.3d 645, 655 (7th Cir. 2001) (determining ERISA applied to contributions that were unpaid at the date of suit, but as defendant did pay some of these contributions (albeit delinquently, in violation of the plan), ERISA was not violated. As 1132(g) was inapplicable, they were entitled to enforce the plan's provisions imposing interest and liquidated damages); *Mich. Carpenters Council Health & Welfare Fund v. C.J. Rogers, Inc.*, 933 F.2d 376, 390 (6th Cir. 1991) ("[A]s to liquidated damage assessments which are keyed to these 'unpaid contributions,' the remedy offered by section 1132(g) is exclusive. To recover liquidated damages outside of and in addition to the statutory framework of section 502(g) with its 20% limitation would allow a more expansive remedy than that authorized by the Congress. Thus, to the extent that the Fund's late payment and audit assessment figures reflect assessments based upon contributions which were still unpaid at the time judgment was awarded, recovery of these amounts is barred, and the Fund's recovery is limited to those liquidated damages allowed under section 1132(g)(2).").

[7] After extensive analysis as to why *both* of these claims are acceptable, within the Complaint, and again in the Motion for Default, Plaintiffs *for the first time*— note on the final page of their Draft Order, "[t]he ERISA claim judgment is less than the amounts due under the collective bargaining agreement, but may be enforced and collected along with attorney's fees and costs of collection, without duplication of recovery, *in the event of any error or defect in the judgment entered in paragraphs 2 to 5.*" (ECF No. 14-1 at 5) (emphasis added). As discussed above, there is no reason for both claims, and thus I recommend these damages (ECF No. 14-1 ¶7), not be awarded.

10

states that as of April 4, 2019, Finch owed contributions to the: Pension Fund for $23,510.46; the Annuity plan for $6,318.01; the FTI for $487.79; and the LMCI for $487.79. (ECF No. 14-4 at 3). Mr. O'Malley stated that these figures are based on reports prepared by Finch and submitted to the fund. (ECF No. 14-4 at 3–4). Of note, because Finch did not submit remittance reports, the Pension Fund estimated the amount due for July 2017 through September 2017. *Id.* To do this, Mr. O'Malley averaged the three months of contributions prior to the first month to which no report was received and divided that number by amount of contributions considered.[8] (ECF No. 14-1 at 2). The Court finds this evidence adequate to establish the amount of unpaid collections that Plaintiffs are entitled to collect under the CBA and 29 U.S.C. § 185. *See Ackerman*, 2012 WL 251963, at *3 ("Plaintiffs calculated the average of the hours Defendant reported in the three previous months and multiplied that average by the applicable contribution rate. This method of estimating contributions in the absence of a remittance report has been approved by other courts.").

(1) Interest

Pursuant to the CBA and Agreement and Declarations of Trust, an employer who fails to pay the amounts required (by the date such is due) owes interest on the unpaid contributions at an interest rate equal to that of the fluctuating IRS interest rate. (ECF No. 14-4). Correspondingly, ERISA provides for the accrual of interest at the rate provided for within the multiemployer plan. 26 U.S.C. § 1132(g)(2)(b). Plaintiffs assert that under the CBA and 29 U.S.C. § 185, Finch owes the Pension Fund, Annuity Plan, FTI, and LMCI interest in the amount of $2,899.06. (ECF No. 14-4 at 4; ECF No. 14-1 at 2). This amount is confirmed within the Declaration of Mr. O'Malley.

---

[8] This calculation is in line with other cases. *Int'l Painters v. H.C. Ackerman & Son, Inc.*, 2012 WL 251963, at *3 (D. Md. Jan. 24, 2012) ("Plaintiffs calculated the average of the hours Defendant reported in the three previous months and multiplied that average by the applicable contribution rate. This method of estimating contributions in the absence of a remittance report has been approved by other courts.").

(ECF No. 14-1 ¶¶ 3, 4, 10). Mr. O'Malley states that the amounts listed in the "interest" Column of the table, *supra*, were calculated using the fluctuating IRS rate, as required. (ECF No. 10 ¶ 3). The Court finds this evidence adequate to establish the amount of interest the Plaintiffs are entitled to collect. Accordingly, the Court recommends an award of $2,899.06.

(2) Liquidated Damages

Section 1132(g)(2) of ERISA provides for liquidated damages for—

(C) an amount equal to the greater of—
    (i) interest on the unpaid contributions, or
    (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A).
29 U.S.C. § 1132(g)(2)(C).

Plaintiffs contend that under the CBA and 29 U.S.C. § 185, they are owed liquidated damages of $6,160.85. (ECF No. 14-1 at 2). The Declaration of Mr. O'Malley clarifies that Section 10 of the Plan parallels ERISA. (ECF No. 14-4 ¶10). As discussed above, the total interest owed is $2,899.06. Thus, in this case, the accrued interest on Finch's unpaid contributions is less than twenty percent of the unpaid contributions. Plaintiffs therefore calculated liquidated damages at twenty percent of the outstanding contributions—$6,160.81. (ECF No. 14-4).[9] I therefore recommend that amount be awarded as liquidated damages.

(3) Attorneys' Fees and Costs

Plaintiffs' Counsel claim $1,600.95 in costs for items such as photocopies, computer research, filing fees, and service fees. (ECF No. 14-10 at 5). Those are reasonable charges for out-of-pocket expenses incurred by attorneys in the representation of their clients, and I recommend they be awarded.

---

[9] Mr. O'Malley's Declaration states that twenty of Defendant's unpaid contributions amounts to $6,160.85. (ECF No. 14-4 at 4). However, twenty percent of $30,804.05 is $6,160.81. Accordingly, I recommend this be awarded.

In calculating the appropriate award of attorneys' fees, the Court must first determine the "Lodestar" amount, which is defined as "a reasonable hourly rate multiplied by hours reasonably expended." *Grissom v. Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008).[10] In this Circuit, in deciding what constitutes a reasonable number of hours and rate, courts utilize twelve factors.[11] These considerations include:

> (1)[T]he time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to properly perform the legal service; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Thompson v. HUD*, 2002 WL 31777631, at *6. n.19 (D. Md. Nov. 21, 2002) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)).

In sum, the rate that is ultimately used in the lodestar depends on the prevailing market rate "in the relevant community for the type of work for which [claimant's counsel] seeks an award." *Eastern Ass'n Coal Corp v. Dir.*, 724 F.3d 561, 572 (4th Cir. 2013). Specifically, an attorneys' prior fee awards may serve as a "barometer" of the prevailing market rate. *Id.* (discussing attorneys' fees under the BLBA).

---

[10] Within Plaintiffs' Memorandum of Law, Counsel based their calculations at to the allowable fees as described by the Court of Appeals for the Third Circuit. (ECF No. 14-2 at 15). As required, this Court will utilize the framework as provided for by the Court of Appeals for the Fourth Circuit, and precedent within this Circuit. Further, Plaintiffs' Counsels cites an extensive amount of cases in support of the requested attorney's fees, none of which appear to be from this Circuit. Plaintiff cites precedent from: the Court of Appeals for the Third Circuit; E.D. N.Y.; E.D. Pa.; D. Del.; the Court of Appeals for the Ninth Circuit; the Court of Appeals for the Sixth Circuit; Court of Appeals for the Eighth Circuit, D. Minn; the Court of Appeals for the Seventh Circuit; and the Court of Appeals for the Tenth Circuit. (ECF No. 14-2 at 15–19). Although the Court of Appeals for the Fourth Circuit adopted the twelve-factor reasonableness standard outlined by the Third Circuit, that happened in 1978. *See Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978). This lack of precedent from within this Circuit is particularly confounding, as Counsel litigate within this Circuit, and specifically this Court, very often.

[11] *See also Amaya v. Power Design, Inc.*, 2018 WL 690838, at *2 (D. Md. Feb. 2, 2018) ("[C]ourts have been less than consistent in determining whether the Johnson factors 'inform the calculation of the lodestar,' whether they instead should be used to make 'upward or downward adjustments to it,' or whether they should serve 'both purposes.' Without determining which, if any, approach is correct, the Fourth Circuit noted with approval that determination of the lodestar multipliers often subsumes consideration of many of the Johnson factors." (quoting *McAfee v. Boczar*, 738 F.3d 81, 89–90 4th Cir. 2013))).

13

After determining the Lonestar figure, courts "subtract fees for hours spent on unsuccessful claims related to successful ones" and award "some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *Robinson v. Equifax Information Servs.*, 560 F.3d 235, 244 (4th Cir. 2009). A trial court may exercise its discretion in determining the lodestar amount because it possesses "superior understanding of the litigation," and the matter is "essentially" factual. *Thompson v. HUD*, 2002 WL 31777631, at *6 n.18

Here, according to Ms. Sznyter's Declaration, Plaintiffs' Counsel billed at a "composite" rate of $375.00 per hour for attorney time, and $120.00 per hour for paralegals. (ECF No. 14-9). The rates charged for the most experienced attorneys, Dawn Costa and Judith Sznyter, and the rate for the two paralegals comport with the "Guidelines for Hourly Rates" as set forth in Appendix B of the Local Rules of this Court.[12] Although this rate for the most experienced attorneys falls within the guidelines, charging $375 per hour for work of attorneys Ms. Ward, Mr. McCarthy, and Mr. Keenan exceeds the range provided for in the Guidelines. L.R App'x B (3)(e) (providing for lawyers admitted to the bar for less than five (5) years an appropriate fee is between $150 and $225). Consequently, pursuant to this Court's Interim Order, Plaintiffs' Counsel supplemented its affidavit and adjusted the fees of Keenan and McCarthy to $225 and $300 for attorney Ward. (ECF No. 18).

Despite providing Plaintiffs' Counsel with an additional opportunity to justify fees that fall at the high end of the spectrum, they failed to do so. Counsel merely stated that a uniform rate of

---

[12] In considering the overall reasonableness of the fee, the Local Guidelines are not definitive; but are "solely to provide practical guidance to lawyers and judges when requesting, challenging, and awarding fees." L.R. App'x B (2018). Appendix B to this Court's Local Rules ("Rules and Guidelines for Determining Attorneys' Fees in Certain Cases") provides that lawyers admitted to the bar for twenty years or more may reasonably bill $300-475 per hour, and that paralegals and law clerks may reasonably bill $95-150 per hour. *Id.* Notably, in a Report and Recommendation dating from February 2016, then-Magistrate Judge Gallagher, of this Court, permitted an equal hourly "composite" rate of $340.00 on behalf of Ms. Costa and Ms. Sznyter, but adjusted the rate of the associate attorneys to $175 per hour. *Sign Maint.*, 2016 WL 447319, at *5.

$375 per hour results in savings to "Plaintiffs because senior attorneys with considerable experience could have commanded higher rates within the Appendix B guidelines however they agreed to compromise their fees," and "the evidence resented in the Affidavit of Judith Snyzter [as previously provided] demonstrates that the rates for [the attorneys] are reasonable." (ECF No. 18 at 3).[13] Further, Plaintiffs' Counsel failed to provide the Court with information as to how long attorneys Ward, McCarthy, and Keenan have been admitted to the bar, or how the twelve *Johnson* factors listed above apply to their work.[14] Accordingly, the rates for Ms. Ward, Mr. Keenan, and Mr. McCarthy will be further adjusted to $175 per hour. *See, e.g.*, *Sign Maint.*, 2016 WL 447319, at *5 (finding $175 to be a reasonable hourly fee for associate attorneys with one and two years of experience); *Int'l Painters v. Williamsport Mirror & Glass Co.*, 2015 WL 567304, at *6 (D. Md. Feb 9, 2015) ("Thus, the rate for Mr. Hagarty, who has eight years of legal experience, will be adjusted to $300 per hour, and the rate for Mr. Tokarsky, who appears to have only a few months of legal experience, will be adjusted to $150 per hour.").[15]

After calculating the appropriate rate, the Court must determine whether the hours worked were reasonable. The Plaintiffs submitted an itemization of legal fees and costs. (ECF No. 14-10). This itemization shows that the attorneys billed a total of 68.3 hours: 28 hours in case

---

[13] In another case within this Court, Judge Bredar deemed a "special fee" schedule with Plaintiffs to be reasonable. This fee schedule afforded $220/hour rate for attorneys and a $70/hour rate for paralegals or clerks. Further, the timesheet reflected 28 hours worked by four attorneys, one paralegal, and one legal assistant. *Ackerman*, 2012 WL 251963, at *4.

[14] Ms. Sznyter's affidavit fails to state when Dominique Ward was admitted to the bar, and merely states that she "has been an associate at the firm since November of 2018." (ECF No. 14-9). Nonetheless, Plaintiff still requested that she be awarded $300. In addition, Counsel only states that Mr. Keenan and Mr. McCarthy graduated from law school at Drexel in 2016. Even presuming both attorneys were also admitted to the bar in 2016, both have been admitted for less than five years. *See also Amaya*, *supra* note 12, at *2.

[15] The Supplement provided by Counsel states "after applying the Appendix B guidelines . . . the total fees for legal services is $20,005.95." (ECF No. 18). Thus, $20,005.95, minus the Appendix B totals for the three lawyers (as calculated by defendant as $10,507.50) defines the remaining fees of the paralegals and the two Attorneys, as $9,498.45. *See* (ECF No. 18 at 2).

15

development, including initial investigations, file setup and communications with opposing counsel (which, obviously, did not occur in this case); 17 hours in the preparation of pleadings, and 23.3 hours in motions practice. *Id.* at 9.

Ms. Snyzter's Declaration does not explain what made this case different or more difficult than prior cases, nor why so many hours were expended on a case which, eventually, was resolved on a Default Judgment.[16] Specifically, the Motion for Default Judgment was almost identical to that used by Counsel in previous cases before this Court, and the evidence provided by Plaintiff in support of the damages and injunctive relief requested was similarly rudimentary.[17] This is not to discredit the value of Counsel's expertise and experience. On the contrary, this Court acknowledges the Declaration of Ms. Snyzter wherein she accentuated the experience and specialty of the firm with cases of this nature. Specifically, she noted "we serve as counsel or co-counsel to over 20 multiemployer benefit funds groups. The firm currently has 11 lawyers, with a dedicated benefits department of six (6) lawyers. The work is specialized and our competition often is large corporate firms with both employee benefits and federal litigation experience." (ECF No. 14-9 at 6). The value of such experience is paramount in cases such as this, as counsel can apply such knowledge, and refrain from extensive billing of clients.[18]

---

[16] *Zavala v. Volcan*, 2019 WL 2366363, at *10 (D. Md. June 4, 2019) (deeming 27.2 hours to be reasonable. "[A]s Defendants defaulted, Plaintiffs were presented with no opposition to their presentation of the facts of the situation.").

[17] *See, i.e.*, *Williamsport*, 2015 WL 567304, at *5 ("Plaintiffs' attorneys in this case billed an equal hourly rate of $340.00 for each of the attorneys who worked on the matter, and $110.00 for their paralegal. The rate for the two most experienced attorneys, Ms. Costa and Ms. Sznyter, and the rate for the paralegal comport with the "Guidelines for hourly rates" set forth in Appendix B of the Local Rules of this Court.").

[18] *Sweeney v. Khan*, 2017 WL 2833252, at *7 (D. Md. June 30, 2017) ("To be sure, an inexperienced lawyer would most likely spend at least 2.5 hours, if not more, in drafting this Complaint. But, it is difficult to understand how an experienced attorney spent 2.5 hours in drafting this particular Complaint. And, as noted, it pertains to four plaintiffs, only one of whom has prevailed. Therefore, I will reduce the compensable time from 2.5 to 2 hours.").

The 68.3 hours charged were unreasonable given that there was nothing unusual about this case, the nature of the legal issues, or the procedural posture to warrant such extensive time and cost.[19] Accordingly, as recently outlined by Magistrate Judge Day:

> Where 'lumping' or other inadequate documentation is present in a fee application, courts may either identify and exclude improperly documented hours or simply reduce the overall fee award by a fixed percentage or amount based on the trial court's familiarity with the case, its complexity, and the counsel involved.

*Zavala*, 2019 WL 2366363, at *11 (quoting *Peterson v. Cty. Sch. Bd.*, 641 F. Supp. 2d 499, 520 (E.D. Va. 2009)).

Here, the Court will endeavor to exclude improperly documented hours.[20] As discussed above, Ms. Snyzter's Declaration emphasizes Plaintiffs' potential savings due to this special "flat fee," and contends that such was in place from the *onset of this suit*. As the fee agreement was in place prior to the commencement of litigation, and Counsel provides no explanation as to why additional time was required for tasks relating to billing including: "correspondence" or "review of billing," on 4/1/19; 4/2/19; and 4/10/19. (ECF No. 14-10 at 7–8), I recommend deducting these entries.[21]

Of further concern, this Court's Docket indicates no filings between October 5, 2018 and March 14, 2019.[22] As such, the work that Counsel billed to Plaintiffs during this time, seemingly,

---

[19] *Villatoro v. CTS & Assocs. Inc.*, 2016 WL 2348803 (D. Md. May 4, 2016) ("The number of hours expended is well-documented and appears reasonable given the inclusion of multiple plaintiffs and the several attempts to resolve this case without court assistance. Counsel spent 42.4 hours on this case from the initial consultations with Plaintiffs in March 2014 through the drafting of the motion for default judgment over a year later. Accordingly, $14,380.00 will be awarded for work performed by Plaintiffs' counsel.").

[20] *See also Peterson*, 641 F. Supp. 2d at 520 (reducing overall attorneys' fee by 10% where "[t]he lack of specificity in the [plaintiffs'] time records render[ed] it impossible to determine the amount of time attributed to non-recoverable activities or the appropriate rate at which the [p]laintiffs may recover for any given activity").

[21] This amounts to a reduction of 5.9 hours. Given the nature of the agreement between Counsel and Plaintiff, the instant case is different than those wherein "denial of fees, for the time spent obtaining fees, would dilute the value of the fee award itself." *See I.N.S. v. Jean*, 492 U.S. 154, 162 (1990).

[22] On March 14, 2019, Judge Hollander issued an Order Directing Plaintiffs' Counsel to file a status report. (ECF No. 11)

bore no fruit. Although Plaintiffs' Counsel spent many hours preparing the Motion for Default during this time, additional hours of work on this same issue cropped up in March 26, 2019 and continued through April of 2019. (ECF No. 14-10 at 4–9). The excessive and duplicative charges are outlined below, and my recommendations are correspondingly addressed.

| Date | Attorney Name | Narrative | Time Claimed | Time Allowed |
|---|---|---|---|---|
| 6/20/18 | DJK | Review of correspondence | .10 | 0 |
| 11/6/18 | RPM | Conference with Attorney D. Ward regarding Case History and Next Steps | .2 | 0 |
| 11/7/2018 | DBW | Preparation of correspondence regarding status of service; Review of file in Preparation of Documents; Begin preparation of Motion for Judgment of Default | 7.20 | 0 |
| 11/13/2018 | DBW | Review correspondence regarding service of request for entry of Default to Defendant | .10 | 0 |
| 2/5/2019 | DBW | Review and Revision of Motion for Judgment by Default | 1.75 | 0 |
| 2/11/2019 | DBW | Review and Revision of Draft Motion for Judgment by Default | 1.25 | 0 |
| 2/12/2019 | DBW | Review and Revision of Motion for Judgment by Default | .75 | 0 |
| 4/1/19 | DBW | Conference with L. Phillips regarding Hours Billed; Conference with Attorney McCarthy regarding hours billed; Conference with attorney Snytzer regarding 55(b) Review and revision of 55(b) | 4.1 | 2.0 |
| 4/2/19 | DBW | Correspondence with Attorney Sznyter regarding review and revision of 55(b) and billing Correspondence with client Review and Revision of 55(b) Preparation of Attorney Biography Review of Status Report | 2.9 | 0 |
| 4/10/19 | DBW | Correspondence with L. Phillips regarding Exhibits for 55(b) and Hours Correspondence with client regarding address for company Correspondence with Attorney Sznyter regarding Billing hours for April | .9 | 0 |

Accordingly should be awarded fees for 14.85 hours: $2,598.75.[23] Next, DJK, who spent only a few minutes "reviewing correspondence," should be awarded no fees, and finally, RPM

---

[23] DBW worked 19.2 hours through March 2019 (ECF No. 14-10); and 12.6 hours in April. (ECF No. 14-10 at 9). Thus, DBW *charged for* a total of 31.8 hours. Although Plaintiffs' Counsel failed to provide the Court with a breakdown of the hours worked by each attorney (except for the month of April), according to the Court's calculations, after removing the duplicative entries (which amount to 16.95 hours), DBW may bill for 14.85 hours (at the rate of $175 per hour, as discussed above).

should be awarded fees for 20.6 hours, and thus his total fees should be reduced to $3,605.[24] Considering the invoices provided by Plaintiffs' Counsel, and their supplemental briefings, the *Lonestar method*, and the twelve *Johnson* factors, this Court recommends that the Plaintiffs' Counsel's requested number of hours be reduced as outlined above, as to remove such entries that are excessive and duplicative.[25] With these adjustments, the legal fees owed are $15,702.20, plus $1,600.95, in costs for a total of $17,303.15.[26]

Even as adjusted, the total remains on the high end of the fees and costs awarded in similar cases in this district. *See Int'l Painters v. 3 R Painting & Contracting Co., Inc*, 2013 WL 424694, at *9 (D. Md. Jan. 31, 2013) (awarding attorney's fees of $10,842.00 and costs totaling $636.31, amounting to $11,478.31 for the 54.6 hours billed by Counsel); *Sign Maintenance*, 2016 WL 447319, at *5 (citing cases wherein attorney's fees were deemed reasonable: $6,155.65 in fees and costs, $6,928.26 in fees and costs; $5,845.75 in fees and costs and recommending an award of $7,268.42).

## IV. CONCLUSION

For the reasons set forth above, I recommend that:

1. The Court GRANT Plaintiffs' Motion for Judgment by Default (ECF No. 14); and

---

[24] This number is equivalent to the total 20.8 hours worked by RPM, minus the duplicative entry of .20. (ECF No. 18 at 2).

[25] *Cf. Md. Elec. Indus. Health Fund v. MESCO Inc.*, 2014 WL 4660813 (D. Md. Sept. 16, 2014) (utilizing a similar chart and reducing four entries based on the content of the entries that plaintiffs offered, wherein Judge Hollander's view, the time stated was excessive). *See also Radcliffe v. Comm'r of Soc. Sec.,* 2016 WL 1383508, at *2 (N.D. W.Va. Apr. 7, 2016) ("As an initial matter, it is within the Court's discretion to apply a reasonable percentage reduction 'as a practical means of trimming fat from a fee application.'" (quoting *Hogan v. Astrue*, 539 F. Supp. 2d 680, 683 (W.D.N.Y. 2008))).

[26] As Plaintiff's Counsel did not provide the court with a breakdown of the time worked by each lawyer, this amount shall be adjusted accordingly with these Recommendations. Specifically, it is unclear if Plaintiff included the amount of hours worked, but not billed, in the final analysis. *See, e.g.*, (ECF No. 14-10 at 2).

2. The Court awards Plaintiffs the following amounts against Defendant:

    a.    Contributions:    $30,804.05

    b.    Interest:    $2,899.06

    c.    Liquidated Damages:    $6,160.81

    d.    Attorney's Fees and Costs:    $17,303.15

TOTAL: $57,167.07, in accordance with the recommendations above.

I also direct the Clerk to mail a copy of this Report and Recommendations to Finch at the address listed on Plaintiffs' Complaint. (ECF No. 1). Any objections to this Report and Recommendations must be served and filed within fourteen (14) days, pursuant to Federal Rule of Civil Procedure 72(b) and Local Rule 301.5.b. I suggest that, if Plaintiffs do not file objections, they should provide a revised proposed Default Judgment Order to Judge Hollander for signature, in the event she concurs with this Report and Recommendations.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions, and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report. Such failure shall bar you from challenging on appeal the findings and conclusions accepted and adopted by the District Judge, except upon grounds of plain error.

Date: November 15, 2019                        /s/

                                                        J. Mark Coulson
                                                        United States Magistrate Judge